UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:03CV-427-R

YUSEF ALI, AS ADMINISTRATOR
OF THE ESTATE OF MARSHALL MARBLY, DECEASED                    PLAINTIFF

v.

CITY OF LOUISVILLE, ET AL,                                   DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. #
20).  Responses and replies have been filed (Dkt. Nos. 25/29, 43, & 44), and the matter is now
ripe for decision.  For the reasons that follow, Defendants' Motion for Summary Judgment is
**GRANTED in part** and **DENIED in part**.

## BACKGROUND

Plaintiff Yusef Ali has filed this action as the administrator of the estate of his brother
Marshall Marbly.  Mr. Marbly died on August 22, 2002, as a result of gunshot wounds inflicted
by  Louisville Metro Police Officers.  Mr. Ali filed two separate actions that were consolidated
in this action: one against the City of Louisville/Louisville-Jefferson County Metro Government
and the other against the individual officers involved in the incident with Mr. Marbly (James
Kaufling, Patty Hanifen, Jefferson Atkins, and Eric Johnson).

The Plaintiff's response alleges that Mr. Marbly was a homeless, mentally ill man living
in his 1992 Saturn GS in Louisville's West End neighborhood.  It further alleges that on August
22, 2002, people on the street told the police, who were driving by, that a person was standing in
the middle of the street acting like he was shooting cars. It alleges that Mr. Marbly was known to

1

several of the officers as a person with mental illness.  Further, it alleges that an eyewitness, Jeffery Warner, reported that Mr. Marbly came toward Officer Atkins with his cane, and that when Officer Atkins went to his trunk and got out a shotgun, Mr. Marbly went back to his car.  It alleges that Mr. Warner also stated that another police car arrived on the scene, and while another officer drew his gun, Officer Atkins held the shotgun and screamed, "Get out of the car. Get out of the car."

Deposition testimony indicates that the police blocked Mr. Marbly's car so he could not drive away. In his deposition, Sgt. Johnson testified that the officers could not communicate with Mr. Marbly with the windows rolled up on his car (Depo. of Eric Johnson, p. 31). In contrast, Officer Kaufling testified that he could hear what Mr. Marbly was saying even though the windows were rolled up on the car. (Depo. of James Kaufling, p. 18).  Officer Kaufling claimed that Mr. Marbly was saying "stuff about being Jesus Christ." (Id.). He also stated that Mr. Marbly had a cane with a rope around it in one hand and a flashlight in the other hand (Id. at 17).

Officer Kaufling stated that the officers checked the doors to see if they were unlocked and backed away from the car to talk a minute (Id. at 19). After that, Officer Seymour busted out the rear driver's side window. (Id.). Likewise, Sgt. Johnson testified that after a brief discussion between Sgt. Johnson and Officer Seymour, they decided to break out the rear window on the driver's side (Depo. of Eric Johnson, p. 37). Officer Hanifen testified that Sgt. Johnson made the decision to break out the window (Depo. of Patty Hanifen, p. 23).

Sgt. Johnson claimed that they tried to talk with Mr. Marbly (Depo. of Eric Johnson, p. 38).  In response, Sgt. Johnson reported that Mr. Marbly pointed his keys and a little flashlight at the officers, and said "this is my phaser" and this is a "tractor beam." (Id. at 39). Mr. Marbly also

2

allegedly said, "You're dead" to the officers and "I'm Jesus Christ." (Id. at 39-40). Then, Mr. Marbly came out of the back window and struck Officer Seymour with a cane (Id. at 42). At that point, Sgt. Johnson testified that Officer Seymour deployed his pepper spray (Id. at 43). At this same point, Officer Kaufling testified that one of the officers deployed pepper balls (Depo. of James Kaufling, p. 19). Officer Grissom also testified that Officer Atkins fired pepper balls into the car at this point (Depo. of Jason Grissom, p. 73). In contrast, Sgt. Johnson testified that pepper balls were not deployed until after Mr. Marbly showed a knife (Depo. of Eric Johnson, p. 103).

Pepper balls are fired from a gun similar to a paintball gun using compressed air (Id. at 69). The pepper balls are harder than paint balls because they are intended to cause pain on impact (Id. at 69-70). When they explode on impact, they release a cloud of pepper powder causing breathing difficulty or discomfort, watering of the eyes, and general pain (Id. at 70).

After the pepper balls were allegedly fired, Officer Grissom stated that Mr. Marbly continued pointing the cane, acting like it was a gun and making shooting noises. (Depo. of Jason Grissom, p. 77). There are many different statements about how the drivers' side window was broken out. Officer Kaufling said Officer Seymour broke the window out with an expandable baton because he did not want to get close to Mr. Marbly (Depo. of James Kaufling, p. 20). Officer Seymour said that he broke it out with his Maglite (Dkt. # 40, Exh. B). Sgt. Johnson said he thinks the breakout tool was used again (Depo. of Sgt. Johnson, p. 45).

Officer Kaufling told a different story from Sgt. Johnson's account of when Officer Seymour was struck with the cane (Depo. of James Kaufling, p. 21-22). Officer Kaufling stated that after the driver's window was broken out Mr. Marbly tried to hit Officer Seymour and Sgt.

Johnson with his cane (Id. at 21).  The officers tried to grab the cane from Mr. Marbly, but Mr. Marbly struck Officer Seymour with the cane, cutting him on the forearm (Id. at 21-22). Officer Kaufling, like Sgt. Johnson, stated that Officer Seymour sprayed Mr. Marbly with pepper spray at that point (Id. at 27).

Another version of the actions taken at point in time was Officer Hanifen's account, in which she claimed that the driver's window was broken out so that the officers could "mace him." (Depo. of Patty Hanifen, p. 23-24).  After the window was broken, she and Officer Seymour used mace, which has also been referred to as pepper spray and is sometimes called OC spray. (Id. at 24). Mr. Marbly stuck the cane out of the front window and hit Officer Seymour (Id. at 30). Officer Hanifen stated that after Officer Seymour was stabbed with a cane in the arm, pepper balls were deployed (Id. at 29). She thought that Jason Grissom fired the pepper balls (Id. at 28). She also thought that the pepper balls were deployed at about the same time Mr. Marbly pulled out the knife (Id. at 31).  The officers fired bean bag rounds about the same time that Mr. Marbly showed the knife (Id. at. 34).  In contrast, Officer Atkins stated that pepper balls were fired, then pepper spray was used, then pepper balls were used again, and then the beanbag shotgun was used when Mr. Marbly produced a knife (Depo. of Jefferson Atkins, p. 55-56).

Providing yet another version of the events occurring in this time frame, Officer Grissom stated that after the driver's window was broken out, the officers asked Mr. Marbly to come out (Depo. of Jason Grissom, p. 83).  When Mr. Marbly did not come out, Officer Atkins fired several rounds of pepper balls into the vehicle (Id. at 83).  Officer Grissom claimed that it was after two rounds of pepper balls that Officer Seymour was stabbed in the arm with the cane (Id. at 86-87).  After this, Officer Grissom said, Officer Hanifen and Officer Seymour sprayed Mr.

Marbly with pepper spray (Id. at 86).  Then, Officer Grissom testified, after the pepper spray, Sgt. Johnson told Officer Grissom to use the beanbag shotgun (Id. at 91).  Officer Grissom fired two rounds of beanbags (Id. at 96).  While the officers were having discussions about trying to grab the cane, Mr. Marbly produced a knife (Id. at 96).  When Officer Hanifen said, "gun," Officer Grissom saw Mr. Marbly's gun (Id. at 107).  Then, he shot his beanbag shotgun three more times (Id. at 107-08).

Officer Kaufling claimed that Mr. Marbly produced a knife after Officer Seymour sprayed him (Depo. of James Kaufling, p. 29).  Then, he claimed, after a few minutes, the officers deployed pepper balls again (Id. at 32).  After that, Kaufling said, Officer Grissom fired beanbag rounds into Mr. Marbly's chest or abdomen (Id. at 34).  According to Officer Atkins, Sgt. Johnson told Officer Grissom to fire the bean bag gun (Depo. of Jefferson Atkins, p. 59).  Officer Atkins testified that Officer Grissom fired the bean bag gun, because Mr. Marbly had a knife (Id. at 56 & 58). In contrast, Officer Seymour stated that after bean bag rounds were deployed, Mr. Marbly produced a knife (Dkt. # 44, Exh. B).

Because Mr. Marbly had a knife, Sgt. Johnson claimed that he wanted to have a fire hose hooked up near Mr. Marbly's car (Depo. of Sgt. Johnson, p. 62).  Sgt. Johnson stated that it is hard to defend the officers from a knife attack so they wanted Mr. Marbly to stay in the car (Id.).  If Mr. Marbly got out of the car, it would have been hard for him to attack the officers while being hit with water from the fire hose (Id.).

Next, Officer Hanifen climbed onto the retaining wall beside Mr. Marbly's car so she could see in the car (Depo. of Eric Johnson, p. 52). Sgt. Johnson cautioned the other officers that she was on the wall and to be careful (Id. at 52-53). When Officer Hanifen yelled "gun," Officer

Atkins saw Mr. Marbly reach over toward the passenger side (Depo. of Jefferson Atkins, p. 77-78). Officer Kaufling stated that he saw Mr. Marbly pull what looked like a rifle from in between the seats, and Mr. Marbly raised the barrel above the door (Depo. of James Kaufling, p. 38). Officer Kaufling claimed that Mr. Marbly said "I got something for you" before he turned to get the gun (Id. at 39-40). When Officer Kaufling saw the barrel, he shot four or five rounds from his pistol at Mr. Marbly (Id. at 42). Then, Officer Kaufling could see Mr. Marbly was bleeding (Id. at 45). After that, Officer Kaufling saw Mr. Marbly, with the gun in his right hand, raise the barrel again (Id. at 46). Officers Kaufling and Atkins fired their weapons at Mr. Marbly a second time (Id. at 46).  Officer Kaufling thought he shot four or five rounds the second time (Id. at 46).

Officer Atkins said that the reason that he shot both times was that he saw Mr. Marbly reach toward the passenger's seat (Depo. of Jefferson Atkins, p. 80-81). When the officers fired their weapons, Officers Atkins, Kaufling, and Seymour were standing about the same distance from Mr. Marbly, fairly close together, with Seymour on the right and Kaufling on the left (Id. at 77). Officer Atkins, however, did not see the gun until after he had fired two rounds at Mr. Marbly (Id. at 81).  Witnesses at the scene did not see the gun either.

Defendants Hanifen and Kaufling claimed that Mr. Marbly was holding the gun in his right hand.  Photographs show that Mr. Marbly's right hand was badly damaged but that the gun was not damaged.  Mr. Ali reasons that if Mr. Marbly had turned toward the Officers with the gun, then the gun would have been between Mr. Marbly and the Officers, so the gun would have been damaged before Mr. Marbly's hand was.

Reginald Allard, plaintiff's expert, opined that Officers Kaufling and Atkins were standing seven to eight feet away from Mr. Marbly's car with no cover.  If they had been behind

6

cover, such as the behind the wheel well of their police cruisers, he asserts, they could have waited longer before firing their weapons. Their decision to stand out in the open, he opined, was dangerous. Mr. Allard also opined that putting Officer Hanifen on the retaining wall put her in danger.

Several of the officers had dealt with Mr. Marbly before, knew him and knew that he was mentally ill. When they arrived on the scene, it was also apparent to the officers that Mr. Marbly was mentally ill because he said that he was shooting them with his "phasers and tractor beams" and that he was Jesus Christ.

One of the officers had previously had an altercation with Mr. Marbly when making a landlord tenant call in February 2002. Mr. Marbly was not tried on those charges because he was found to be incompetent. Mr. Marbly had had a separate incident where he was found shooting a pellet gun in the street and police took away the gun and arrested him.

## STANDARD

A movant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" in a summary judgment inquiry only when they could affect the case's outcome under the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Stated differently, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id*. Furthermore, an issue of material fact is "genuine" only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

**DISCUSSION**

**Excessive Force**

Under the Fourth Amendment, an officer may use reasonable force when making an arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "As in other Fourth Amendment contexts...the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Because we lack a precise definition of reasonableness under the Fourth Amendment, the Court instructs us to look to the particular facts and circumstances in each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "reasonableness of the officer's belief as to the appropriate level of force should be judged from [the] on-scene perspective" of the officer, not the "20/20 vision of hindsight." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

8

Whether the person is mentally ill is a factor to be considered in the reasonableness of force employed. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). To determine whether the right to be free from excessive force is clearly established, this court must look to decisions of the Supreme Court, this circuit, other circuit, other courts, and even the training of the officers. *Id.* at 902-04. The officers' training and expert testimony demonstrates that persons with mental illness should be handled in calm manner. When officers do not handle them in this manner and use any force, violence between the officers and the person with mental illness will escalate.

The Defendants argue that this case should be analyzed in segments so that the seconds leading up to their firing of their service revolvers and killing Mr. Marbly should be analyzed separately from the other events in the evening. Segmenting is the approach that courts in this circuit have taken. In *Claybrook v. Birchwell*, 274 F.3d 1098 (6th Cir. 2001), the Sixth Circuit Court of Appeals analyzed both incidents of deadly force separately instead of just analyzing the one that ended the decedent's life. *Id.* at 1106. In *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004), the Sixth Circuit Court of Appeals analyzed several uses of force separately, including pepper spraying, shoving, grappling, and firing shots at suspect. Further, the court stated that courts should analyze whether the "seizure was reasonable in the totality of the circumstances not whether it was reasonable for the police to create the circumstances." *Id.* "However, they may consider the moments preceding a shooting as part of the context of that shooting." *Id.* (internal quotations omitted).

Courts in other circuits have looked at the shooting and the events leading up to the shooting together. For instance, in a recent First Circuit Court of Appeals case, the court

examined the events leading up to the shooting, not just the moment of the shooting because such a rule is more consistent with the Supreme Court's mandate for courts to consider "these cases in the totality of the circumstances." *Young v. City of Providence*, 404 F.3d 4, 22 (1st Cir. 2005). Likewise, the Ninth Circuit Court of Appeals looks at the conduct before deadly force is used: "even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). Further "if...an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law." *Id*. at 1190-91

*Use of pepper spray*

The Sixth Circuit Court of Appeals has held that when a person's crime is not severe and the person is not threatening anyone's safety or attempting to evade arrest by flight, use of pepper spray could constitute excessive force. *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002). *See also Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (finding a factual dispute about the use of mace was for the jury to decide); *Atkins v. Twp. of Flint*, 94 Fed. Appx. 342, 348-49 (6th Cir. 2004);  *Vaughn v. City of Lebanon*, 18 Fed. Appx. 252 (6th Cir. 2001).

The recent Sixth Circuit Court of Appeals case, *Gaddis*, 364 F.3d at 775-76, said the following about pepper spray and persons who are mentally or emotionally disturbed:

> In sum, Bain used an intermediate degree of nonlethal force to subdue a suspect who had previously attempted to evade arrest, was brandishing a knife, showed signs of intoxication or other impairment, and posed a clear risk of leaving the scene behind the wheel of a car. It cannot be said that this action was unconstitutionally excessive.

10

Gaddis disputes this reasoning, arguing that his incoherent remark about "Chris" put Bain on notice that Gaddis was disturbed, and that this made special tactics appropriate. Gaddis argues that a reasonable officer, suspecting Gaddis's disability, would not have responded to the brandishing of a knife by pointing a gun at Gaddis. Nor would he have "provoked" Gaddis by using an irritating and disorienting device such as pepper spray against him, as Bain did. Instead, a reasonable officer would have used a nonconfrontational manner that would ensure that Gaddis was not provoked to violence. To support this argument, Gaddis offered the affidavit of Prof. James Fyfe, a law enforcement expert. Fyfe testified that in his opinion, the officers' tactics in the encounter with Gaddis were "terrible" and were not in keeping with optimal police procedures for dealing with mentally or emotionally disturbed persons.

We acknowledge that a suspect's apparent mental state is one of the "facts and circumstances of [the] particular case," *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, that should be considered in weighing an excessive force claim. Moreover, the opinions of properly qualified experts such as Mr. Fyfe are often entitled "to be given ... weight" in this determination. *Russo*, 953 F.2d at 1047.FN11 In *Russo*, we drew partially upon such testimony in concluding that the inadequate training procedures of the Cincinnati police department may have contributed to the shooting death of the plaintiff's suicidal, mentally ill decedent. *See id.* at 1046-47.

> FN11. However, we note that the weight of such expert testimony is diminished to the extent that the expert draws near to opining on the ultimate legal question of whether the officers' challenged conduct was reasonable. See *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir.1990); *Burger v. Mays*, 176 F.R.D. 153, 157 (E.D.Pa.1997).

However, Gaddis's arguments here are weakened by the fact that Bain had only fragmentary evidence that Gaddis was mentally disturbed. This distinguishes the case from *Russo*, where officers knew from the outset that the suspect was mentally disturbed because the initial call to the police came from the mental institution the suspect had left. *Id.* at 1039. Here, Gaddis's incoherent conduct was arguably as consistent with Bain's initial hypothesis that Gaddis was driving while intoxicated as it was with mental disturbance. The Supreme Court has instructed that we are to judge officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. There may be more than one reasonable response to a given situation, and when this is so, the Fourth Amendment does not require officers to use "the most prudent course of action" to handle it. See *Cole*, 993 F.2d at 1334. In light of the circumstances and our reasoning above, we conclude Fyfe's

11

> affidavit is not sufficient to create a material issue of fact as to the reasonableness
> of Bain's use of pepper spray.

*Id.* at 775-76.  Here pepper spray was used on a person who the officers knew was mentally or emotionally disturbed and who was barricaded in an immobilized vehicle (blocked in and the tires were flatten at some point but there is a factual dispute as to when this happened).  Here there is a genuine issue of material fact about when both pepper balls and pepper spray were used on Mr. Marbly and what Mr. Marbly's actions were at the time.  At least one defendant, Sgt. Johnson, claims that the knife was shown before pepper balls were deployed, but Officer Grissom testifies that the knife was not produced until after the bean bag rounds were shot.  Further, the expert testimony in *Gaddis* is consistent with the expert testimony and training of the officers here that using any force against a mentally disturbed person will cause an escalation in violence.

*Use of beanbag shotgun and deadly force*

Courts have examined whether the degree of force was necessary for both bean bag rounds and shots from service revolvers.  In *Deorle v. Rutherford*, 272 F.3d 1272, 1280-82 (9th Cir. 2001), the Ninth Circuit Court of Appeals addressed a case where an emotionally disturbed man was shot with a bean bag gun.  The Court stated that it must determine whether "the degree of force used was necessary, in other words, whether the degree of force used was warranted by the governmental interests at stake." *Id*. at 1282.  In that case, the degree of force was not justified because the man was only carrying a bottle or can of lighter fluid toward the officers.  *Id*.

The Sixth Circuit Court of Appeals has upheld the use of deadly force when a reasonable officer would have believed that there was a serious threat of physical harm to the officer or others in the area. *Sample v. Bailey*, 409 F.3d 689, 696-97 (6th Cir. 2005).  *See Bell v. City of East Cleveland*, 125 F. 3d 855, 1997 WL 640116 *3 (6th Cir. 1997) (finding that it was reasonable to shoot a boy who pointed a BB gun at a policeman).

Likewise, each action taken by the officers should be analyzed to determine whether that degree of force was necessary.  There are material factual disputes about the order of events.  For instance, some witnesses say the beanbag rounds were fired before he drew his knife and some say that it was after.  Some witnesses say that pepper balls were used at different times.  Each use of pepper balls, pepper spray, and bean bag rounds has to be segmented from the other.  There is a material factual dispute about the order in which each incident of non-lethal force was used.  Because a reasonableness test must be applied to each use of force depending on the totality of the circumstances including what Mr. Marbly was doing when the force was used, the court cannot determine whether these uses of force are reasonable until the factual disputes are settled.        While this court must follow Sixth Circuit Court of Appeals precedent and segment and analyze the incidents of force separately, arguably, the officers' disregard for their training in dealing with emotionally or mentally disturbed persons and increased use of force led to all of the events, which eventually resulted in the shooting of Mr. Marbly. However, because the Court must follow the segmenting approach, the Court holds that the shooting of Mr. Marbly must be analyzed separately from the events  previous to the moments right before the shooting.  In this case, in the moments right before the shooting, Mr. Marbly raised a gun, which was later

13

discovered to be a BB gun, at the officers, and it was reasonable for them to believe that their lives were in danger, necessitating the officers' use of deadly force.

The evidence indicates that Officer Kaufling only used deadly force.  Therefore, Officer Kaufling is dismissed from this action.  Officer Hanifen used no deadly force on Mr. Marbly, but she did use pepper spray on Mr. Marbly. The evidence indicates that Officer Atkins used both non-deadly and deadly force against Mr. Marbly.  Any claim involving deadly force against Officer Atkins is dismissed; however, claims that Officer Atkins used non-deadly force (like pepper balls) against Mr. Marbly survive summary judgment.

This court holds that there is a material factual dispute about the uses of pepper spray, pepper balls, and bean bag rounds on Mr. Marbly.  This factual dispute must be settled before the court can determine whether these different levels of force were reasonable.

**Municipal Liability**

Suits against municipal officers in their official capacities are the same as suits against their municipality.  *See Brandon v. Holt*, 469 U.S. 464 (1985).  Such suits may be maintained even in the face of the Eleventh Amendment, *see Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978), so long as the plaintiff proves the unconstitutional actions are the result of the policy or custom of the municipality. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998)(citing *Monell*, 436 U.S. at 690-91 (1978)).  There are five ways in which a governmental entity may be charged with an official policy or custom: (1) actions by the municipal legislative body, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1980); (2) actions by municipal agencies or boards that exercise authority delegated by the municipal legislative body, *Monell*, 436 U.S. at 661; (3) a policy decision by an individual or entity with final

14

decision-making authority, *Pembaur*, 475 U.S. at 483-84; (4) a policy of inadequate training or supervision, *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); and (5) custom or usage, *Pembaur*, 475 U.S. at 481-82 n.10. *Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 538 (W.D. Ky. 2005).

Louisville Metro Government cannot be held liable solely for employing a tortfeasor because it cannot be held liable on a *respondeat superior* theory. *Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004). Instead, "[t]here must be a direct causal link between the policy and the alleged constitutional violation such that the [municipality's] deliberate conduct can be deemed the moving force behind the violation." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291 at 311 (6th Cir. 2005).

Plaintiff must show that "the City pursued an official custom or policy of failing to adequately train, supervise, or discipline its officers in a particular matter, and (2) that such official policy or custom was adopted by the official makers of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 996 n.8 (6th Cir. 1994)(citing *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989)).

A city's failure to train is actionable under § 1983 when it reflects the city's deliberate indifference to the constitutional rights of its citizens. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). "To be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury."

15

*Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). The 6th Circuit has given two

instances where a failure to train would be actionable:

> One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction, as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force. A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers.

*Id*. See also *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1997).  Here the Plaintiff has not

shown that the City has failed to act in response to repeated complaints or that the City has failed

to instruct the officers in how to deal with persons with mental illness.  Instead, Plaintiff alleges

that the Defendants disregarded their training. The City cannot be held responsible for one act of

failure to properly apply the training it gave its police officers.

**Medical Treatment**

"The Due Process Clause [of the Fourteenth Amendment], however, does require the

responsible government or governmental agency to provide medical care to persons,...who have

been injured while being apprehended by the police." *City of Revere v. Mass. Gen. Hosp.*, 463

U.S. 239, 244 (1983). "It is well established that 'deliberate indifference to the serious medical

needs of prisoners' constitutes cruel and unusual punishment in violation of the Eighth

Amendment [and] [w]hile the Eighth Amendment does not apply to pretrial detainees such as

[Mr. Marbly], the Fourteenth Amendment affords pretrial detainees a due process right to

adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners."

*Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004)

(citations omitted).[1]  The Sixth Circuit has explained that "deliberate indifference" is more than

negligence.

> Deliberate indifference requires that the defendants knew of and disregarded a substantial
> risk of serious harm to [Mr. Marbly's] health and safety.  The standard is subjective.  It is
> not enough that there was a danger of which an officer should objectively have been
> aware. "[T]he official must both be aware of facts from which the inference could be
> drawn that a substantial risk of serious harm exists, and he must also draw the inference."
> If an officer fails to act in the face of an obvious risk of which he should have known but
> did not, the officer has not violated the Eighth or Fourteenth Amendments.

*Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (citations omitted).

In this case, the officers knew that Mr. Marbly had been shot and had life threatening

injuries.  The officers claim that Mr. Marbly moved after he had been shot and they were

required to wait for the SWAT team to arrive to extract him from his vehicle.  Evidence has been

submitted that at least two ambulances were on the scene when Mr. Marbly was shot, but the

police would not allow them to treat him. Witnesses have given several different estimates of

how long that Mr. Marbly was bleeding in the car from gunshot wounds before he was taken to

the hospital.  Some of the estimates have him waiting for an ambulance for as long as 45

minutes.  It is clear that the police knew that he needed medical attention.  The police cite safety

concerns as the reason for not giving him medical care.

Here the police were not deliberately indifferent to Mr. Marbly's medical needs.  Instead,

they called the SWAT team to get Mr. Marbly out of his car.  The SWAT team, instead of EMS

personnel, removed Mr. Marbly from his car because the police were unsure if Mr. Marbly still

---

[1]This is a bit of an oversimplification of Mr. Marbly's status.  His status was more
closely analogous to a pre-trial detainee than a prisoner although there could be a question of
whether at that point Mr. Marbly had been detained and whether his detention was an arrest or an
involuntary hospitalization.

posed a threat.  Mr. Marbly was in a car with a weapon and could have harmed EMS personnel trying to give him medical treatment.

**ADA**

The Sixth Circuit in *Thompson v. Williamson County*, 219 F.3d 555 (6th Cir. 2000) addressed the issue of whether an arrestee was denied services in the following passage:

> Under the ADA, "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132….
>
> An individual is disabled for the purposes of the ADA if the person has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [has] a record of such an impairment; or [is] regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).  To be a "qualified individual with a disability," the person must "with or without reasonable modifications to rules, policies, or practices ... meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2). ...
>
> Although there is no doubt that their son was disabled under the ADA, the Thompsons have failed to produce any evidence that he was denied either access to a public service, or if he was, that such denial was ***because of his disability.*** *See Bonds*, 20 F.3d at 701(when reviewing summary judgment, court may only consider pleadings, evidence, and affidavits submitted prior to plaintiff's motion to alter or amend judgment); *Ogletree v. McNamara*, 449 F.2d 93, 99 (6th Cir.1971) (facts not alleged in amended complaint upon which summary judgment granted are not properly before court). The record indicates that when the Thompsons called 911, they requested and received police assistance. Although they wanted their son taken to a medical facility, it would have still been necessary for Gooding to disarm the decedent before he could be transported anywhere. Gooding's failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled.

*Id*. at 557.  (Internal footnotes omitted; emphasis in original).  The Fifth Circuit Court of Appeals

held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).

The defendants do not dispute that Mr. Marbly had a disability; rather, they claim that Mr. Marbly did not receive services because of his violent, threatening behavior.  In light of our holding that Mr. Marbly's behavior justified the use of deadly force, it stands to reason that in the moments immediately following that use of force, the Defendant Officers were justified in taking further steps to ensure the safety of themselves and those at the scene (i.e., waiting for the SWAT team to extract Mr. Marbly) before providing medical treatment. Therefore, this claim must be dismissed.

**Supervisor Liability**

"Supervisory liability under § 1983 cannot be based upon a mere failure to act but must be based upon active unconstitutional behavior." *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002). Further, Mr. Ali must show that the supervisor encouraged or condoned the actions, played more than a passive role, or showed more than a mere tacit approval of the actions. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). Another recent Sixth Circuit opinion states that a plaintiff must show more than the supervisor's negligence, recklessness, or sloppiness, but must show the supervisor's deliberate indifference to the Plaintiff's constitutional rights. *Doe v. City of Roseville*, 296 F.3d 431, 439-40 (6th Cir. 2002).

> Supervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a

history of widespread abuse puts the responsible supervisor on notice of the need
to correct the alleged deprivation, and he [she] fails to do so. The deprivations
that constitute widespread abuse sufficient to notify the supervising official must
be obvious, flagrant, rampant, and of continued duration, rather than isolated
occurrences.

*Id.* at 440.  Sgt. Johnson participated in the alleged excessive force.  The claim cannot be decided

because a factual dispute remains, and consequently, the claim against Sgt. Johnson cannot be

resolved either.

The defendants argue that the Plaintiff has not made this claim in any of his complaints

or amended complaints.  A liberal reading of his complaint shows that Plaintiff incorporated both

of his complaints in the two consolidated cases together in his amended complaint and the

complaint could be construed as stating a claim for supervisory liability.  Even if this were not a

proper reading, this court under Federal Rule of Civil Procedure 15(a) gives the Plaintiff leave to

amend his complaint. *See also Tucker v. Union Needletrades, Indus., and Textile Employees*, 407

F.3d 784, 788 (6th Cir. 2005).

**Kentucky State-Law Immunity**

Under Kentucky law, "[o]fficial immunity is immunity from tort liability afforded to

public officers and employees for acts performed in the exercise of their discretionary functions.

It rests not on the status or title of the officer or employee, but on the function performed."

*Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). If sued as individuals, "public officers and

employees enjoy only qualified official immunity, which affords protection from damages

liability for good faith judgment calls made in a legally uncertain environment."  *Id.* at 522.

Such immunity attaches to the performance of discretionary acts or functions, undertaken in

good faith and in the "scope of the employee's authority." *Id*.  Accordingly, "qualified immunity

[is] defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Id.* at 523 (internal citations and quotations omitted).  The Kentucky Supreme Court went on to explain that a showing that the officers acted without good faith depends on "a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to the person in the plaintiff's position." *Id.*  A material factual dispute remains about whether a constitutional violation has occurred.  Therefore, immunity cannot be granted at this time.

## CONCLUSION

The Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. The excessive force claims against Officers Hanifen and Atkins for using non-deadly force, and against Sgt. Johnson for supervising while the officers used non-deadly force remain.  All other claims are dismissed.  An appropriate order shall issue.

21